**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

MARKIECE PALMER,

Petitioner,

v.

TIM GARRETT, et al.,

Respondents.

Case No. 3:18-cv-00245-HDM-CLB

**ORDER DENYING SECOND
AMENDED PETITION FOR
WRIT OF HABEAS CORPUS
UNDER 28 U.S.C. § 2254**

**[ECF No. 58]**

Petitioner Markiece Palmer, a Nevada prisoner, has filed a counseled Second Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (ECF No. 58 ("Petition").) This matter is before this Court for adjudication of the merits of the remaining grounds in the Petition,[1] which allege that the trial court failed to instruct the jury about lesser-included offenses, the prosecution misrepresented the law during closing arguments and referenced Palmer's decision not to testify, the evidence was insufficient to support Palmer's conviction for first-degree murder, Palmer's trial counsel was ineffective, law enforcement failed to give Palmer a *Miranda* warning before his custodial interrogation, jury instructions 12 and 13 were erroneous, and the information and jury instruction 3 contained improper felony murder allegations. (*Id.*) For the reasons discussed below, this Court denies the Petition and a certificate of appealability.

I.      **BACKGROUND**[2]

On November 29, 2012, at 8:11 a.m., paramedics responded to an apartment complex in Las Vegas, Nevada regarding an unconscious 7-year-old boy. (ECF No. 34-1 at 41, 49, 51, 59.)

---

[1] This Court previously dismissed grounds 6 and 10. (ECF No. 68.)

[2] This Court makes no credibility findings or other factual findings regarding the truth or falsity of this evidence from the state court. This summary is merely a backdrop to this Court's consideration of the issues presented in the Petition.

Paramedics examined the boy, RJ[3], and found that he was suffering from possible intracranial pressure given that his eyes were unresponsive and dilated. (*Id*. at 44, 56.) While the paramedics were transporting RJ to the hospital, they noticed bruising on RJ's chin, and RJ's mother, Dina Palmer (hereinafter "Dina"), informed them that RJ "hit himself or he ran into something" the evening before. (*Id*. at 45, 55.) Later, when speaking with hospital staff, Dina stated that RJ "was running and fell and hit his chin, but then went to bed and was fine, he had no problems after hitting his head." (*Id*. at 96–97.) Hospital staff undressed RJ and saw a "significant amount of bruising and swelling . . . down the back of his legs." (*Id*. at 101.) RJ also had "a number of injuries that had [a] sort of U-shaped appearance through[out] his entire body," bruises on his back, and "skin sloughing off his buttocks." (*Id*. at 105, 116, 130.) At this time, Dina "blurted out that [RJ] was disciplined for lying the night before" by his stepfather, Palmer. (*Id*. at 109.)

RJ's CAT scan showed swelling of his brain and blood between his brain and skull, so "the neurosurgeon felt the best thing to do at that time was to remove some of the skull . . . to try to keep it from compressing more of the brain as it swelled." (ECF No 35-1 at 11.) RJ's brain swelling was "felt to be a severe traumatic brain injury" and was "the type of injury [doctors] see with high-speed motor vehicle accidents." (*Id*. at 12, 24.) After a portion of RJ's skull was removed, his brain expanded close to an inch outside of his skull within a minute or two. (ECF No. 36-1 at 176.) According to the neurosurgeon, it was "[a]bsolutely" reasonable that RJ would have had a better outcome had intervention taken place immediately after the traumatic event rather than 8 or so hours later. (*Id*. at 180.) RJ was declared brain dead on November 30, 2012. (*Id*. at 209.) During

---

[3] Pursuant to the Local Rules, this Court identifies RJ, a minor child, exclusively by his initials. LR IA 6-1(a).

RJ's autopsy, it was determined that he suffered from "chronic physical abuse" due to the "53 separate areas of injury" on the exterior of his body. (*Id*. at 225, 233.)

The day before RJ was taken to the hospital, on November 28, at approximately 4:15 a.m., Maria Mendoza, a neighbor who shared a common wall with the apartment that RJ, Dina, and Palmer lived in, heard RJ crying and yelling, Palmer telling someone to lay down, and Dina calling someone a liar. (ECF No. 34-1 at 214, 216, 218.) Later that morning, Mendoza, who regularly took RJ to school, saw that RJ was in pain while walking and sitting in the car. (*Id*. at 221–22.) When Mendoza asked RJ what happened, RJ said that he fell down the stairs. (*Id*. at 222.) Mendoza reported the situation to Child Protective Services. (*Id*. at 223.)

After RJ arrived at school that morning, November 28, 2012, he confided in his teacher about the general discipline his mother and stepfather would inflict on him, explaining that they would "hit [him] hard on the back of the head" and spank him on his back, buttocks, and the back of his legs with belts, spatulas, and extension cords. (*Id.* at 176–77.) Regarding the discipline he had received earlier that day, RJ told his teacher that he had gotten in trouble for lying about reading the Bible. (*Id*.) RJ's teacher told the school counselor. (*Id*. at 178–88.) The school counselor met with RJ, and RJ, who was "grimacing in pain as he [was] walk[ing]," told her that he was "regularly" disciplined. (*Id*. at 188–89, 192.) The school counselor had RJ lift his shirt, and she saw "older lash marks" on his back that showed he had been whipped. (*Id*. at 190.) RJ told the school counselor that "both his mother and [Palmer] would physically discipline him," indicating that "it was more intense when [Palmer] would do it, and it would almost definitely leave a mark when [Palmer] would physically discipline him." (*Id*. at 193.) The school counselor notified Child Protective Services. (*Id*. at 191.)

Later that night, November 28, 2012, at around 10:00 p.m. or 10:30 p.m., Mendoza heard more noises coming from the apartment that RJ, Dina, and Palmer lived in. (*Id*. at 229.) Specifically, Mendoza heard three loud noises that "sounded like somebody slamming a door . . . and striking a door." (*Id*.) Another neighbor also heard these sounds and described them as sounding like furniture banging against a wall and a woman "screaming something in regards to lying." (*Id*. at 268–69.)

The next morning, November 29, 2012, at about 7:00 a.m., Palmer called his pastor, Kenneth Hollingsworth, and told him that RJ would not wake up. (*Id*. at 299–300.) Hollingsworth told Palmer to call 911, Palmer told Hollingsworth that he could not because he had whipped RJ with a cord, and Hollingsworth again told Palmer that he needed to call 911. (*Id*. at 326.) Hollingsworth hung up the phone, but he called Palmer back 15 minutes later (*Id*.) Hollingsworth asked Palmer if he had called 911, and Palmer said that he had not but that he was going to get a friend to take them to the hospital. (*Id*.) Hollingsworth demanded that Palmer call 911, which Palmer did sometime thereafter. (*Id*.) Hollingsworth went to the hospital several hours later, and when Palmer saw Hollingsworth, Palmer told him "[t]hey got me." (*Id*. at 303.)

Accordig to Dina's trial testimony, Palmer first left disciplinary marks on RJ in mid-October 2012 when Palmer whipped RJ on his back and buttocks and struck him near his bellybutton with a belt buckle. (ECF No. 35-1 at 101–03.) Dina and Palmer beat RJ on a regular basis near the time of his death for "lying and not reading his Bible." (*Id*. at 109–11.) Dina and Palmer would take turns beating RJ with a broom stick, a belt, a shoe, and a coaxial cable. (*Id*. at 112.) According to Dina, Palmer's beatings of RJ "got more severe and more involved" because Palmer wanted to "get [RJ] to finally cry, to break him one time, get his will broken." (*Id*. at 120.) On November 28, 2012, at roughly 4:15 a.m., Dina and Palmer both beat RJ. (*Id*. at 137.) Later

4

that day, around 10:00 p.m., Palmer beat "beat RJ so severely [with a broom stick] that RJ [went] down on his knees, g[ot] back up, [and] g[ot] beaten down on his knees again." (*Id*. at 148.) Palmer told Dina, who was not in the room, that RJ then "charged" at Palmer before running downstairs. (*Id*. at 149.) Dina "whoop[ed] RJ first" with a shoe for having "charged" at Palmer, and then carried RJ back upstairs, saying "[y]ou're mine now." (*Id*.) Dina "whoop[ed] RJ first" with a shoe for having "charged" at Palmer, and then Palmer "hit him in the back of the head" with his hand. (*Id*. at 149–50.) Palmer grabbed RJ, held him up in the air against the wall, and shook him. (*Id*. at 150.) "RJ's head lean[ed] back and hit . . . the wall," leaving a dent in the drywall. (*Id*.) RJ stated that he did not feel well and believed he was going to vomit. (*Id*.) RJ then passed out. (*Id*.) Dina unsuccessfully tried to revive RJ by splashing some water on his face. (*Id*.) Palmer "eventually sa[id], 'I think we should call 911'" but then said that he did not "want to spend the rest of [his] life in jail." (*Id*. at 151.) Dina rocked RJ in her arms until she fell asleep. (*Id*.) Dina eventually called 911 the next morning after Palmer's phone calls to Hollingsworth. (*Id*.) Dina pleaded guilty to two counts of child abuse and neglect resulting in substantial bodily harm regarding her participation in RJ's abuse. (*Id*. 68.)

Law enforcement interviewed Palmer at the hospital on November 29, 2012, at 12:30 p.m. (*See* ECF No. 24-9.) In that interview, Palmer described and reenacted his discipline of RJ the previous night: he spanked RJ with a belt, RJ attempted to attack Palmer, Palmer grabbed RJ's arm and shook him, RJ ran downstairs, RJ ran into a table and fell to the floor, and then Palmer grabbed RJ and took him back upstairs for his bath. (*Id*. at 3–5; *see also* ECF No. 36-1 at 244–47.) A videotape of Palmer's reenactment was played for the jury. (*See* ECF No. 36-1 at 247.)

A jury convicted Palmer of one count of first-degree murder and two counts of child abuse with substantial bodily harm. (ECF No. 20-5.) Palmer was sentenced to, *inter alia*, life without the

possibility of parole. (ECF No. 20-7.) Palmer appealed, and the Nevada Supreme Court affirmed the convictions. (ECF No. 24-4.)

Palmer filed two *pro se* motions alleging, among other things, that his trial counsel failed to suppress his statements to police in violation of *Miranda*. (ECF Nos. 21-4; 21-5.) The state district court construed the motions as a postconviction petition for writ of habeas corpus and denied all claims. (ECF No. 38-19.) Palmer appealed, and the Nevada Supreme Court affirmed the state district court's denial of relief. (ECF No. 24-6.)

Palmer filed a *pro se* federal habeas corpus petition and a counseled amended petition. (ECF Nos. 7, 19.) Respondents moved to dismiss the amended petition, and Palmer moved for a stay so that he could return to state court to exhaust a newly alleged claim. (ECF Nos. 30, 47.) This Court granted a stay and denied Respondents' motion to dismiss without prejudice. (ECF No. 49.)

Palmer filed a second state postconviction petition, but the state district court dismissed it as untimely and successive. (ECF No. 46-5.) Palmer appealed, and the Nevada Supreme Court affirmed, finding that (1) Palmer's second state postconviction petition was procedurally barred as untimely, successive, and an abuse of the writ, and (2) Palmer failed to demonstrate cause and prejudice to overcome the default of his claims. (ECF No. 52-2.)

This Court granted Palmer's request to reopen this case, and Palmer filed his instant Petition. (ECF Nos. 54, 58.) Respondents moved to dismiss the Petition. (ECF No. 61.) This Court granted the motion, in part, (1) dismissing grounds 6 and 10 as procedurally defaulted and (2) deferring consideration of whether Palmer can demonstrate cause and prejudice to overcome the procedural defaults of grounds 5(b)-5(f) and 7-9 until the time of merits review. (ECF No. 68.) Respondents then answered the remaining grounds in the Petition, and Palmer replied. (ECF Nos.

80, 86.) Palmer then moved for an evidentiary hearing, Respondents opposed, and Palmer replied. (ECF Nos. 87, 90, 94.)

## II.     GOVERNING STANDARDS OF REVIEW

### A.     The Antiterrorism and Effective Death Penalty Act ("AEDPA")

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be

7

more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10) (internal citation omitted). The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

### B.    Ineffective assistance of counsel

In *Strickland v. Washington*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that counsel's "representation fell below an objective standard of reasonableness," and (2) that counsel's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable

effect on the outcome of the proceeding." *Id*. at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687.

Where a state court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Richter*, 562 U.S. at 104–05. In *Richter*, the United States Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *Id*. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential."). The Supreme Court further clarified that, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

## III.    DISCUSSION

### A.    Ground 1—trial court did not instruct about lesser-included offenses

In ground 1, Palmer alleges that the trial court did not instruct the jury about lesser-included offenses in violation of his Fifth, Sixth, and Fourteenth Amendment rights. (ECF No. 58 at 15.) Palmer explains that, under Nevada law, if a person unintentionally kills a child during an act that does not meet the legal definition of child abuse, the defendant would not be guilty of felony murder but might be guilty of involuntary manslaughter or second-degree murder. (*Id*. at 16, 18.)

#### 1.    Background information

Palmer's trial counsel asked for an involuntary manslaughter instruction. (ECF No. 37-1 at 32.) Palmer's trial counsel then explained the basis for that request:

The testimony that came into evidence was that RJ told the school personnel that he fell down the stairs. In falling down the stairs he may have suffered this traumatic head injury, or at least that was the beginning of the traumatic head injury.

Additionally, there has been testimony in regards to - - or at least there is evidence that has been admitted by the Court in regards to Dina Palmer's first statements. And in those first statements she stated that RJ hit his head on the 28th, when running down the stairs he hit the table.

Additionally, we have in evidence the videotape statement of Mr. Palmer, where Mr. Palmer also states that RJ hit his head while running and he hit that kitchen table. Thereafter Mr. Palmer, in his statement, and other witnesses, specifically Ms. Palmer, have stated that he was shaken.

We contend that with the medical evidence as is, that it wasn't clear from the defense point of view that it had to be an instantaneous reaction, that there could have been some delay in the reaction, and that delay in the reaction would be based upon however the individual would handle the traumatic effect. In this case RJ wasn't instantaneously unconscious.

And so we're saying that he could have sustained the trauma and still have been walking around cognizant of what was going on, and therefore any shaking by Mr. Palmer could have exasperated his injuries and eventually have caused his death. And therefore we are asking for the involuntary manslaughter instruction on that basis.

(*Id*. at 33–34.) The state district court denied the request, explaining that "there's no evidence here in this case to support that alternate theory." (*Id*. at 37.)

## 2.   State court determination

In affirming Palmer's judgment of conviction, the Nevada Supreme Court held:

On appeal, Palmer first argues that the district court erred by rejecting lesser-included offense jury instructions on involuntary manslaughter*, second-degree murder, and "attempt crimes" because there was evidence RJ's death was an accident. We disagree.

"This Court reviews a district court's decision to issue or not to issue a particular jury instruction for an abuse of discretion." *Ouanbengbourne v. State*, 125 Nev. 763, 774, 220 P.3d 1122, 1129 (2009). If the district court erred, this court conducts a harmless error analysis. *Cortinas v. State*, 124 Nev. 1013, 1023-24, 195 P.3d 315, 322 (2008). We have previously held that "a defendant is entitled to a jury instruction on a lesser-included offense 'if there is any evidence at all, however slight, on any reasonable theory of the case under which the defendant might be

convicted' of that offense." *Rosas v. State*, 122 Nev. 1258, 1264-65, 147 P.3d 1101, 1106 (2006) (quoting *Lisby v. State*, 82 Nev. 183, 188, 414 P.2d 592, 595 (1966)), *abrogated in part by Alotaibi v. State*, 133 Nev., Adv. Op. 81, 404 P.3d 761 (2017). However, an instruction is unnecessary if the State "has met its burden of proof on the greater offense and there is no evidence at the trial tending to reduce the greater offense." *Id*. at 1265, 147 P.2d at 1106 (quoting *Lisby*, 82 Nev. at 188, 414 P.2d at 595).

We first conclude that Palmer was not entitled to an involuntary manslaughter jury instruction. During trial, Palmer requested an involuntary manslaughter instruction based on the theory that RJ's killing was an accident. The district court denied this request because the only evidence supporting the request were statements by Palmer himself and the inconsistent testimony of Dina, which she later admitted was a lie. Thus, a lesser-included offense instruction was not warranted because the evidence presented supported only a theory of intentional child abuse. *Graham v. State*, 116 Nev. 23, 29, 992 P.2d 255, 258 (2000) (holding it is unnecessary to give jury instructions for involuntary manslaughter "when proofs in the case can only support a theory of guilt described within one of the specifically enumerated categories set forth in NRS 200.030(1)," because if the killing is done with malice and in an enumerated manner, it is necessarily first-degree). We therefore hold that the district court did not abuse its discretion by denying Palmer's request for an involuntary manslaughter instruction, and to the extent it may have, such error was harmless given the weight of the evidence.

Palmer also claims the district court erred by failing to sua sponte instruct the jury as to second degree murder and "attempt crimes." However, "[f]ailure to object to or request a jury instruction precludes appellate review, unless the error is patently prejudicial and requires the court to act sua sponte to protect the defendant's right to a fair trial." *Bowman v. State*, 132 Nev., Adv. Op. 74, 387 P.3d 202, 206-07 (2016) (quoting *McKenna v. State*, 114 Nev. 1044, 1052, 968 P.2d 739, 745 (1998)). Like the involuntary manslaughter instruction, Palmer presented no credible evidence to support a second degree murder or attempt jury instruction. *See Allen v. State*, 97 Nev. 394, 398, 632 P.2d 1153, 1155 (1981) ("The test for the necessity of instructing the jury is whether there is any foundation in the record for the defense theory."). Instead, the evidence overwhelmingly demonstrated that RJ was killed as a result of child abuse, not an accident. We therefore conclude that there was no evidence of a patently prejudicial error entitling Palmer to alternative jury instructions.

(ECF No. 24-4 at 3–4.)

### 3.    Legal standard

"The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294

1  (1973). "[T]he Constitution [also] guarantees criminal defendants 'a meaningful opportunity to

2  present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v.*

3  *Trombetta*, 467 U.S. 479, 485 (1984)).

4        The heart of Palmer's argument is that the state district court prevented him from

5  establishing his defense theory by denying his proposed lesser-included voluntary manslaughter

6  instruction. *See Mathews v. United States*, 485 U.S. 58, 63 (1988) ("As a general proposition a

7  defendant is entitled to an instruction as to any recognized defense for which there exists evidence

8  sufficient for a reasonable jury to find in his favor."); *see also Beardslee v. Woodford*, 358 F.3d

9  560, 577 (9th Cir. 2004) ("Failure to instruct on the defense theory of the case is reversible error

10  if the theory is legally sound and evidence in the case makes it applicable."); *Bradley v. Duncan*,

11  315 F.3d 1091, 1099 (9th Cir. 2002) ("[T]he state court's failure to correctly instruct the jury on

12  the defense may deprive the defendant of his due process right to a present a defense."). To be

13  entitled to federal habeas relief, Palmer must demonstrate that the state district court's decision to

14  omit his proposed jury instructions "had substantial and injurious effect or influence in determining

15  the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993); *see also Byrd v. Lewis*,

16  566 F.3d 855, 860 (9th Cir. 2009) (explaining that "to obtain relief, [Petitioner] must show that the

17  alleged instructional error had substantial and injurious effect or influence in determining the jury's

18  verdict" (internal quotation marks omitted).)

19        **4.   Analysis**

20        Palmer asserts a lesser-included instruction was warranted based on Dina's trial testimony

21  that RJ's head hit the wall by accident while Palmer was shaking him, and because the jury heard

22  evidence that both Dina and Palmer had initially told law enforcement that RJ's head injury

23  occurred while running and hitting his head against a table. (ECF No. 58 at 17.) However, in light

of all the evidence introduced at trial, this de minimis evidence – some of which was even recanted by Dina on the stand – was so insubstantial that there is no reasonable jury would have found Palmer guilty of a lesser offense even if the instruction been offered. Accordingly, this court concludes the Nevada Supreme Court was not unreasonable in holding that Palmer was not entitled to a lesser-included instruction. *See Mathews*, 485 U.S. at 63. Even assuming he was entitled to a lesser-included instruction, that the failure to give such an instruction did not have a "substantial and injurious effect" on the jury's verdict.  Because the state courts reasonably rejected this claim, Palmer is not entitled to federal habeas relief for ground 1.

**B.      Ground 2—the prosecution misrepresented the law during closing arguments**

In ground 2, Palmer alleges that the prosecution misrepresented the law during closing arguments in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 58 at 19.) Palmer explains that the key question for the jury was whether Palmer committed child abuse when he shook RJ, but instead of posing that question, the prosecution urged the jury to convict Palmer of felony murder based on various erroneous legal theories. (*Id*.)

The Nevada Supreme Court concluded that this claim lacked merit without discussion. (ECF No. 24-4 at 8, n.1.) Because the Nevada Supreme Court's opinion "does not come accompanied with [the] reasons" why it denied this ground, this Court "'look[s] through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). This Court "then presume[s] that the unexplained decision adopted the same reasoning." *Id.*

1    **1.    Background information**

2    Palmer first takes issue with the prosecution's arguments that even assuming the act that

3    caused RJ's death was an accident, Palmer was still guilty of murder because he participated in

4    other acts of child abuse. In this regard, the prosecution argued the following:

5    Remember, part of an abuse - - part of abuse here, the part of abuse that supports
     felony murder is a continuous transaction. There's no break here. We've got the
6    abuse going on. They're handing each other, you know, RJ off essentially. The
     abuse happens, whether at the moment of the actual fatal head injury, it is either
7    [Palmer] or Dina really doesn't matter, because they're both participating in abuse.

8    (ECF No. 37-1 at 87.) Later, the prosecutor argued as follows: "The fact that Dina may be involved

9    directly in the act doesn't matter, because [Palmer] is directly involved in the acts as well." (*Id*. at

10   90.) And finally, the prosecutor then argued the following:

11   So you've already got what we've discussed as far as the evidence to support the
     felony murder charge, regardless of whether or not even [Palmer] was the direct
12   perpetrator of the physical act on that evening that caused it. Because he
     participated and then because after the event took place, as catastrophic as it had to
13   have been based on the medical evidence you have, there had to have been
     awareness. I would submit to you it's the reasonable inference to gather.

14

15   (*Id*. at 92.)

16   Next, Palmer takes issue with the prosecution's arguments that, even assuming the act that

17   caused RJ's death was an accident, Palmer could still be guilty of felony murder because he

18   unreasonably delayed calling 911. In this regard, the prosecution argued the following:

19   In this case the delay in treatment, the decisions that Markiece Palmer made
     because he what, did not want to go to jail for the rest of his life, even though he
20   acknowledged the fact that he knew that 911 needed to be called right then, that
     they wait eight to ten hours to get to a non-survivable event absolutely guaranteed
21   hastened the death of this child.

22   (*Id*. at 50.) Later the prosecutor argued as follows:

23   I ask you to come back with a guilty of murder in the first degree for the events that
     take place not just at that time with RJ, but in the continuous transaction of not

14

seeking attention to save your own skin, hoping it will get better, knowing that there's severe injury that needs to have medical attention and you failed to do so.

(*Id*. at 63.) Then, during rebuttal, the prosecutor argued as follows: (1) "[t]his whole delay in treatment is also important to remember that this is a factor here," (2) "[i]ndependent evidence corroborating what takes place, delay in treatment causing at least prolongation of life, or the actual opposite of that in this case, to get to murder," and (3) "[h]e delays again[, e]very minute that there was brain swelling was brain damage, was further injury." (*Id*. at 90, 92, 98.)

Following closing arguments, outside the presence of the jury, Palmer's trial counsel moved for a mistrial, arguing "that the prosecutor improperly argued the meaning of the law." (*Id*. at 100.) Palmer's trial counsel then made the following assertions in support of his motion:

And I think the impression that the jury is left with is simply if Markiece did not call the ambulance, then he is guilty of first degree murder, and that is not what the law suggests and Instruction 19 does not suggest that.

Specifically it says that the law declares that one who inflicts the injury on another and thereby accelerates his death shall be held criminal responsible therefore. So in order for him to get to the part where there's an extinguishment of death, he has to be found first liable for the injury that would have caused the death.

I think what the prosecutor did was somewhat a slight shift to - - in an attempt to convince the jurors that they don't have to make that finding first, that he inflicted the injury. The only finding that he has to make is that he just didn't do anything about it. And additionally, for there to be liability under that scenario, there had to be an awareness.

And so I think the jury was mis-instructed, or that argument was so pervasive throughout the - - through both of his arguments, including the rebuttal, that we'd move for a mistrial on that basis.

(*Id*. at 101.) The trial court denied the request for a mistrial, explaining the following:

I didn't see it as being an improper argument frankly. If the actions - - what I heard you say is if the actions that the - - the predicate actions that inflict the injury on the child are child abuse, are considered by your jury, found by your jury beyond a reasonable doubt to be child abuse, and thereafter an individual fails to take the necessary actions to - - while the child lives, to at least attempt to save the child's

life, that that's - - that that could - - and the death results, that could constitute felony murder. . . . So I don't think it was a misstatement of the law under McCullough, because that's what you're saying, that he misstated the law. I don't think he misstated the law, so your motion for mistrial is denied.

(*Id.* at 102–03.)

### 2.    Legal standard

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). In making that determination, this Court looks to various factors: "the weight of the evidence, the prominence of the comment in the context of the entire trial, whether the prosecution misstated the evidence, whether the judge instructed the jury to disregard the comment, whether the comment was invited by defense counsel in summation and whether defense counsel had an adequate opportunity to rebut the comment." *Floyd v. Filson*, 949 F.3d 1128, 1150 (9th Cir. 2020) (quoting *Hein v. Sullivan*, 601 F.3d 897, 914 (9th Cir. 2010)). "[P]rosecutorial misconduct[ ] warrant[s] relief only if [it] 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993)).

### 3.    Analysis

The court concludes that these statements of the prosecutor did not have a "substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 637–38. First, the prosecutor clearly explained that RJ's death must have resulted from the child abuse committed by Palmer for Palmer to be found guilty under the felony murder rule. (*See, e.g.*, ECF No. 37-1 at

48 (explaining that "if you perpetrate or attempt to perpetrate child abuse and a killing or a death results, . . . [y]ou are guilty of first degree murder by definition") and at 53 (explaining that the murder charge is "the last abusive event which . . . resulted in the head injury which ultimately resulted in the death")). These statements negated any suggestion that Palmer could be found guilty of first-degree murder for his participation in any non-fatal child abuse or for merely failing to timely call 911. Second, the jury was instructed that first-degree murder is the killing of a child during an intentional act of child abuse. (*See* ECF No. 37-3 at 9, 11, 13.) Third, Palmer's trial counsel reiterated the correct legal question on the murder charge during his closing argument when he stated: "The murder is key here, because you have to find what the prosecutor told you, a specific event of child abuse that resulted in the death of the child." (ECF No. 37-1 at 64.) And Palmer's trial counsel properly rebutted the prosecutor's statements by explaining that jury instruction 19 did not instruct that the jury could find Palmer guilty of first-degree murder because "he let the child die because he delayed in calling the emergency services." (*Id*. at 77.) Fourth, regardless of Palmer's participation in the abuse prior to RJ's death and regardless of Palmer's failure to seek medical care, there was overwhelming evidence presented at the trial that Palmer intentionally inflicted the child abuse upon RJ that resulted in his death. Accordingly, the Court concludes that even if the prosecutor made misleading statements, those statements did not have a substantial and injurious effect on the jury's verdict, and Palmer has not therefore established an entitlement to relief on ground 2 of the petition.

## C.     Ground 3—the evidence was insufficient to support his conviction

In ground 3, Palmer alleges that the evidence was insufficient to convict him of first-degree murder in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 58 at 22.) The Nevada Supreme Court concluded, without discussion, that this claim lacked merit.

1  (ECF No. 24-4 at 8.) This Court "determine[s] what arguments or theories supported or . . . could

2  have supported, the state court's decision" and then "ask[s] whether it is possible fairminded jurists

3  could disagree that those arguments or theories are inconsistent with the holding in a prior decision

4  of [the United States Supreme] Court." *Richter*, 562 U.S. at 102.

5         **1.     Legal standard**

6         "[T]he Due Process Clause protects the accused against conviction except upon proof

7  beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

8  charged." *In re Winship*, 397 U.S. 358, 364 (1970). A federal habeas petitioner "faces a heavy

9  burden when challenging the sufficiency of the evidence used to obtain a state conviction on

10 federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). On direct

11 review of a sufficiency of the evidence claim, a state court must determine whether "*any* rational

12 trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

13 *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The evidence is to be viewed

14 "in the light most favorable to the prosecution." *See id*. Federal habeas relief is available only if

15 the state-court determination that the evidence was sufficient to support a conviction was an

16 "objectively unreasonable" application of *Jackson*. *See Juan H.*, 408 F.3d at 1275 n.13.

17        Sufficiency of the evidence claims are judged by the elements defined by state law.

18 *Jackson*, 443 U.S. at 324 n.16. Under Nevada law, murder is defined, as is relevant here, as "the

19 unlawful killing of a human being . . . [w]ith malice aforethought, either express or implied." Nev.

20 Rev. Stat. § 200.010(1). And under Nevada law, first-degree murder is defined, as is relevant here,

21 as murder "[c]ommitted in the perpetration or attempted perpetration of . . . child abuse." Nev.

22 Rev. Stat. § 200.030(1)(b). Child abuse is defined as "physical injury of a nonaccidental nature to

23 a child under the age of 18 years." Nev. Rev. Stat. § 200.030(6)(b).

2.      **Analysis**

Palmer asserts that the evidence at trial demonstrated that RJ's fatal head injury was accidental. (ECF No. 86 at 41.) Specifically, Palmer asserts that he did not intentionally inflict the head injury; rather, he shook RJ once, causing RJ's head to inadvertently hit the wall. (*Id.*) Palmer's arguments are unavailing.

It is irrelevant under Nevada law whether Palmer intended to inflict a head injury. Indeed, the prosecution was not required to prove that Palmer intended to injure or kill RJ to establish felony murder; rather, the prosecutor was only required to prove that Palmer intended to commit the underlying felony—child abuse—and death resulted. *See Coleman v. State*, 321 P.3d 901, 911 (Nev. 2014) (explaining that "[t]he death could have been intentional, unintentionally, or accidental, but the child abuse must have been nonaccidental"). Because the evidence demonstrated that Palmer's shaking of RJ was nonaccidental—even if the hitting of RJ's head on the wall was accidental—there was sufficient evidence to support Palmer's conviction for felony murder by way of child abuse. Accordingly, the Nevada Supreme Court's rejection of this claim constitutes an objectively reasonable application of clearly established federal law. *In re Winship*, 397 U.S. at 364; *Juan H.*, 408 F.3d at 1274; Nev. Rev. Stat. § 200.010(1); Nev. Rev. Stat. § 200.030(1)(b). Palmer is not entitled to federal habeas relief for ground 3.

D.      **Ground 4—prosecution improperly referenced his decision not to testify**

In ground 4, Palmer alleges that the prosecution improperly referenced his decision not to testify in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 58 at 23.) The Nevada Supreme Court concluded, without discussion, that this claim lacked merit (ECF No. 24-4 at 8), so, again, this Court "determine[s] what arguments or theories supported or . . . could have supported, the state court's decision." *Richter*, 562 U.S. at 102.

### 1.      Background information

During closing arguments, the prosecution made the following comment:

> He is as guilty of this crime as he could be. He admits to his involvement. He perpetrated child abuse over and over again, and there was never a time, according to the testimony even from - - and I point to the stand, but I should point over here - - Markiece Palmer's own words in the video reenactment, where he ever indicates anybody other than him inflicted any injury or punishment on RJ that day. And I'm talking about the day before his presentation to the hospital.

(ECF No. 37-1 at 95.)

### 2.      Legal standard

The Fifth Amendment commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V; *see also Malloy v. Hogan*, 378 U.S. 1, 6 (1964) ("We hold today that the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the State."). A prosecutor's comments on a defendant's failure to testify violate the self-incrimination clause. *Griffin v. California*, 380 U.S. 609, 615 (1965); *see also United States v. Robinson*, 485 U.S. 25, 32 (1988) ("Where the prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence, *Griffin* holds that the privilege against compulsory self-incrimination is violated."). While the prosecution violates *Griffin* when it "direct[ly] comment[s] about the defendant's failure to testify," the prosecution only violates *Griffin* when it "indirect[ly] comment[s about the defendant's failure to testify] . . . if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." *Hovey v. Ayers*, 458 F.3d 892, 912 (9th Cir. 2006) (internal quotation marks omitted). "Reversal is warranted only where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis for

the conviction, and where there is evidence that could have supported acquittal." *Id.* (internal quotation marks omitted); *see also Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987) ("[C]ourts will not reverse when the prosecutorial comment is a single, isolated incident, does not stress an inference of guilt from silence as a basis of conviction, and is followed by curative instructions.").

### 3.    Analysis

Viewed in context, the prosecutor's comment was not manifestly intended to call attention to Palmer's failure to testify and was not of such a character that the jury would have taken the comment as referring to Palmer's failure to testify. *Hovey*, 458 F.3d at 912; *cf. United States v. Gray*, 876 F.2d 1411, 1417 (9th Cir. 1989) ("The prosecutor in this case was simply trying to explain the rationale for his burden of proof, rather than calling attention to Gray's decision not to testify."). Indeed, the prosecutor was merely explaining that Palmer admitted to abusing RJ during his police interview. Accordingly, the Nevada Supreme Court could have reasonably concluded that the prosecutor's statement was not an impermissible comment in violation of *Griffin*, so there was no prosecutorial misconduct. Palmer is not entitled to federal habeas relief for ground 4.

### E.    Ground 5—ineffective assistance of counsel

In ground 5, Palmer asserts several instances of ineffective assistance of trial counsel in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 58 at 24.) Each of Palmer's allegations will be discussed below.

### 1.    Procedural default of grounds 5(b)-5(f)

In this Court's order on the motion to dismiss, it found that grounds 5(b)-5(f) were technically exhausted but procedurally defaulted. (ECF No. 68 at 6.) Palmer argued that he could demonstrate cause and prejudice under *Martinez v. Ryan*, 566 U.S. 1 (2012) to excuse the defaults. (*Id.*) Because "Palmer was unrepresented for his initial review collateral review proceeding," this

Court found that Palmer had arguably met three of the elements of *Martinez*: (1) he had no counsel during his state post-conviction habeas corpus proceedings, (2) his state post-conviction petition was the initial proceeding regarding claims of ineffective assistance of trial counsel, and (3) Nevada law requires that a claim of ineffective of assistance of trial counsel be raised in a post-conviction habeas corpus proceeding. (*Id*. at 7.) However, this Court deferred consideration of the fourth element of *Martinez*: whether the claims of ineffective assistance of trial counsel are substantial. (*Id.*) This Court will now determine, pursuant to a *de novo* review, whether the ineffective assistance of trial counsel claims in grounds 5(b)-5(f) are substantial to overcome the procedural default of these grounds. *See Ramirez v. Ryan*, 937 F.3d 1230, 1243 (9th Cir. 2019).

### 2. Ground 5(a)—failure to file a motion to suppress his statements

In ground 5(a), Palmer alleges that his trial counsel failed to file a motion to suppress his statements to the police. (ECF No. 58 at 24.) Specifically, Palmer disputes the police's allegation that they give him a *Miranda* warning before questioning him, and Palmer asserts that there are no recordings or transcripts to memorialize that fact.

### a. Background information

Abuse and Neglect Specialist Rebecca Baltz testified at Palmer's preliminary hearing that she read Palmer his *Miranda* rights at the beginning of his interview at the hospital. (ECF No. 31-1 at 64.) According to Specialist Baltz, she "consistently read *Miranda*, because, frankly, everyone has that right, not just someone in custody, so he was read the rights." (*Id*.)

Later, at Palmer's trial, Sergeant Eric Kearns testified that he met Palmer at the hospital and asked Palmer if he would talk to him and Specialist Baltz so they could find out what happened to RJ. (ECF No. 36-1 at 244.) Palmer agreed, and they went into a "quiet room there at the pediatric ICU unit." (*Id*.) Once they were in the room, Specialist Baltz explained to Palmer that they "were

there to investigate the injuries to RJ, and asked him if he would be willing to speak to" them. (*Id.* at 244–45.) Palmer agreed, and then "Specialist Baltz read him *Miranda* rights, just so that he understood what his rights were." (*Id.* at 245.) Palmer "said that he understood those rights." (*Id.*) Palmer then explained how he and Dina had disciplined RJ the previous night. (*Id.*) Sergeant Kearns asked Palmer if he would reenact the discipline, and he agreed. (*Id.* at 246.) Sergeant Kearns then brought in a doll for the reenactment and started videotaping Palmer. (*Id.*) That videotape was played for the jury. (*Id.* at 247.)

On March 28, 2016, a year and a half after his trial, Palmer filed a *pro se* motion to suppress, explaining that the police never read him his *Miranda* rights. (ECF No. 21-5 at 14.) Similarly, on April 15, 2019, four and a half years after his trial, Palmer declared that "[t]he police didn't give [him] a *Miranda* warning at any time during or before the videotaped interrogation." (ECF No. 25 at 3.)

During Palmer's state postconviction evidentiary hearing, Palmer's trial counsel testified to his reasons for not filing a pretrial motion to suppress based on the *Miranda* issue:

> [W]e did not have any indication in regards to whether he gave you Miranda warnings or not. He stated in his report that he gave you Miranda warnings. You always said and testified that he did not give you Miranda warnings. And again, even at trial it supported what he said in his report that he did give you Miranda warnings prior to filming your statement.

(ECF No. 23-2 at 27.) As such, according to Palmer's trial counsel, filing a motion to suppress Palmer's statement would have been futile. (*Id.* at 33.)

### b.    State court determination

In affirming the denial of Palmer's post-conviction petition, the Nevada Supreme Court held:

> Palmer next argues that counsel should have moved to suppress his police statement pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), because the investigating

officers did not inform him of and receive a waiver of his rights. The district court found that Palmer was given *Miranda* warnings and waived those rights, and this finding is supported by substantial evidence where the investigating officer testified that he informed Palmer of his rights and that Palmer assented that he understood them and was willing to speak with the officer. As Palmer voluntarily, knowingly, and intelligently waived his *Miranda* rights, a suppression claim would have been futile, *see Mendoza v. State*, 122 Nev. 267, 276, 130 P.3d 176, 181-82 (2006) (discussing waiver inquiry), and counsel is not ineffective in omitting futile claims, *see Ennis v. State*, 122 Nev. 694, 706, 137 P.3d 1095, 1103 (2006). As Palmer's *Miranda* argument fails, his dependent argument that counsel should have moved to suppress evidence seized as a result of his confession likewise fails, as that challenge too would have been futile. The district court therefore did not err in denying this claim.

(ECF No. 24-6 at 4–5.)

### c.   Analysis

There is no dispute that Palmer's interview at the hospital amounted to a custodial interrogation, so under *Miranda v. Arizona*, the prosecution was not permitted to use Palmer's statements stemming from that custodial interrogation "unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). As the Nevada Supreme Court reasonably noted, there was substantial evidence in the record to support the state district court's finding that Palmer was given *Miranda* warnings at the beginning of that custodial interrogation. Indeed, Sergeant Kearns included this fact in his police report, Specialist Baltz testified to this fact at Palmer's preliminary hearing, and Sergeant Kearns testified to this fact at Palmer's trial. The only evidence to the contrary was Palmer's own self-serving statements. *See Womack v. Del Papa*, 497 F.3d 998, 1004 (9th Cir. 2007) (rejecting a petitioner's claim, in part, because "[o]ther than [the petitioner]'s own self-serving statement, there [was] no evidence" to support his allegations). Therefore, given that Palmer's trial counsel lacked sufficient evidentiary support to allege that *Miranda* warnings were not given, the Nevada Supreme Court reasonably determined that a suppression claim would have been futile. *See*

*Kimmelman v. Morrison,* 477 U.S. 365, 375 (1986) (explaining that in alleging that counsel failed to file a pretrial motion to suppress evidence, the petitioner must establish, in part, a reasonable probability that the evidence would have been suppressed). Consequently, the Nevada Supreme Court's determination that Palmer's trial counsel was not ineffective constitutes an objectively reasonable application of *Strickland*'s performance and prejudice prongs and was not based on an unreasonable determination of the facts. Palmer is not entitled to federal habeas relief for ground 5(a).

#### d.      Related ground: ground 7

In ground 7, Palmer alleges that the State failed to give him a *Miranda* warning before their custodial interrogation in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 58 at 39.) In the briefing on Respondents' motion to dismiss, Palmer conceded that ground 7 was procedurally defaulted, but he contended that ground 5(a) could provide cause to excuse the procedural default of ground 7. (*See* ECF No. 68 at 8.) However, because Palmer has not demonstrated that his trial counsel performed ineffectively by failing to move to suppress his statements in ground 5(a), ground 5(a) cannot be used as cause to set aside the procedural default of ground 7. Ground 7 is dismissed as procedurally defaulted.

### 3.      Ground 5(b)—failure to seek a lesser-included instruction

In ground 5(b), Palmer alleges that his trial counsel failed to seek a lesser-included instruction on second-degree murder. (ECF No. 58 at 27.) As was noted in ground 1, Palmer's trial counsel sought a jury instruction on voluntary manslaughter, but he did not seek a jury instruction on second-degree murder. (ECF No. 37-1 at 32.) As this Court discussed in ground 1, any defense theory that Palmer's fatal abuse of RJ was anything but intentional was wholly unsupported by the record. Therefore, for the reasons discussed in ground 1, Palmer fails to demonstrate a reasonable

probability that the trial court would have given a second-degree murder instruction *and* that the jury would have convicted him of second-degree murder had his trial counsel requested such an instruction. As such, Palmer's ineffective assistance of trial counsel claim is not substantial because he fails to demonstrate prejudice under *Strickland*. Because Palmer fails to demonstrate requisite prejudice necessary to overcome the procedural default of ground 5(b), it is dismissed.

### 4.    Ground 5(c)—failure to challenge jury instructions 12 and 13

In ground 5(c), Palmer alleges that his trial counsel failed to challenge jury instructions 12 and 13, which presented a felony murder theory based on neglect. (ECF No. 58 at 28.)

### a.    Background information

Jury instruction 12 provided as follows:

> A person who willfully causes a child who is less than 18 years of age: (a) to suffer unjustifiable physical pain or mental suffering as a result of abuse or, (b) to be placed in a situation where the child may suffer physical pain or mental suffering as the result of abuse is guilty of the offense of Child Abuse.

(ECF No. 37-3 at 14.) And jury instruction 13 provided as follows:

> A person who is responsible for the safety or welfare of a child and who (a) permits or allows that child to suffer unjustifiable physical pain or mental suffering as a result of abuse, or (b) to be placed in a situation where the child may suffer physical pain or mental suffering as the result of abuse is guilty of Child Abuse.

(*Id*. at 15.) Palmer's trial counsel did not object to either of these instructions. (ECF No. 37-1 at 32.)

### b.    Analysis

Palmer was charged with murder and two counts of child abuse, neglect, or endangerment with substantial bodily harm. (ECF No. 32-12.) Nevada law defines child abuse and neglect as either (1) "willfully [causing] a child . . . to suffer unjustifiable physical pain or mental suffering

as a result of abuse or neglect or [placing a child] in a situation where the child may suffer physical pain or mental suffering as the result of abuse or neglect," or (2) "permit[ting] or allow[ing a] child to suffer unjustifiable physical pain or mental suffering as a result of abuse or neglect or [placing a child] in a situation where the child may suffer physical pain or mental suffering as the result of abuse or neglect." Nev. Rev. Stat. § 200.508(1), (2). And as was discussed in ground 3, felony murder by way of child abuse requires "physical injury of a nonaccidental nature to a child under the age of 18 years," Nev. Rev. Stat. §§ 200.030(1)(b), (6)(b), so only "a murder perpetrated by means of 'child abuse,' and not 'child neglect,' constitutes first degree murder." *Labastida v. State*, 986 P.2d 443, 446 (Nev. 1999).

Jury instruction 7 mirrors Nev. Rev. Stat. §§ 200.030(1)(b), (6)(b), so the jury was properly instructed on felony murder by way of child abuse. (*See* ECF No. 37-3 at 9.) And contrary to Palmer's assertions, jury instructions 12 and 13 did not provide further instructions on felony murder; rather, these instructions applied to the counts of child abuse, neglect, or endangerment. Indeed, these instructions substantially mirror Nev. Rev. Stat. § 200.508(1), (2). Thus, because jury instructions 12 and 13 did not apply to felony murder, they did not broaden the scope of first-degree felony murder to include neglect, so Palmer's trial counsel had no basis for an objection. Palmer's ineffective assistance of trial counsel claim is not substantial because he fails to demonstrate deficiency under *Strickland*. Because Palmer fails to demonstrate requisite prejudice necessary to overcome the procedural default of ground 5(c), it is dismissed.

### c.     Related ground: ground 8

In ground 8, Palmer alleges that jury instructions 12 and 13 were legally erroneous in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 58 at 39.) In the briefing on Respondents' motion to dismiss, Palmer conceded that ground 8 was procedurally

defaulted, but he contended that ground 5(c) could provide cause to excuse the procedural default of ground 8. (*See* ECF No. 68 at 10.) However, because Palmer has not demonstrated that his trial counsel performed ineffectively by failing to object to jury instructions 12 and 13 in ground 5(c), ground 5(c) cannot be used as cause to set aside the procedural default of ground 8. Ground 8 is dismissed as procedurally defaulted.

### 5.   Ground 5(d)—failure to challenge felony murder in the information

In ground 5(d), Palmer alleges that his trial counsel failed to challenge the information's improper felony murder allegations. (ECF No. 58 at 32.)

In the prosecution's information, it charged Palmer with murder, alleging that Palmer:

> did, on or between November 28, 2012, and November 30, 2012, then and there, without authority of law and with malice aforethought, willfully and feloniously kill [RJ], a minor child being approximately 7 [years] of age, by subjecting the said [RJ] to acts of child abuse, to-wit: by striking the said [RJ] with a belt and/or shaking him and/or by striking the said [RJ]'s head into a wall and/or causing the said [RJ] to fall down the stairs and/or causing him to hit his head on a table and/or the floor, and/or failing to promptly get the said [RJ] medical attention, and/or by means and manner unknown, all of which resulted in the death of said [RJ].

(ECF No. 32-12 at 4.) Jury instruction number 3, the jury instruction outlining the information, contained identical language. (ECF No. 37-3 at 4.) Palmer argues that the prosecution could not legally argue that he was guilty of felony murder simply by striking RJ's body with a belt or failing to get RJ prompt medical attention. (ECF No. 58 at 32–33.)

### a.   Analysis

Nevada law requires an information to "be a plain, concise and definite written statement of the essential facts constituting the offense charged" and provides that it may allege "that the defendant committed [the offense] by one or more specified means." Nev. Rev. Stat. § 173.075(1), (2). Because the information in this case complied with these requirements and gave Palmer

adequate notice of the various theories of prosecution, Palmer fails to demonstrate that his trial counsel acted deficiently in not objecting to the information. Regarding jury instruction number 3, the jurors were instructed that the language from the information was merely "a formal method of accusing a person of a crime" and that their duty was "to apply the rules of law contained in the[] instructions to the facts of the case and determine whether or not [Palmer] is guilty of the offense charged." (ECF No. 37-3 at 4–5.) Thus, even if the information and corresponding jury instruction relied on an invalid theory of felony murder, they were merely a means of notifying Palmer and the jury of the prosecution's murder charge. They did not contain the law that the jury was instructed to apply to the facts of the case, and as was discussed in ground 5(c), the jury was not improperly instructed regarding felony murder. Consequently, Palmer's ineffective assistance of trial counsel claim is not substantial because he fails to demonstrate deficiency under *Strickland*. Because Palmer fails to demonstrate requisite prejudice necessary to overcome the procedural default of ground 5(d), it is dismissed.

### b.      Related ground: ground 9

In ground 9, Palmer alleges that the information and jury instruction 3 contained improper felony murder allegations in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 58 at 40.) In the briefing on Respondents' motion to dismiss, Palmer conceded that ground 8 was procedurally defaulted, but he contended that ground 5(d) could provide cause to excuse the procedural default of ground 8. (*See* ECF No. 68 at 10.) However, because Palmer has not demonstrated that his trial counsel performed ineffectively by failing to object to the information in ground 5(d), ground 5(d) cannot be used as cause to set aside the procedural default of ground 9. Ground 9 is dismissed as procedurally defaulted.

### 6.      Ground 5(e)—conceded guilt

In ground 5(e), Palmer alleges that his trial counsel conceded his guilt with respect to the child abuse charges without his consent. (ECF No. 58 at 34.)

### a.   Background information

During a break in the jury trial, before the trial court canvassed Palmer about his right to testify, Palmer's trial counsel made the following comments:

> We have discussed the different scenarios in regards to how the evidence is going to come in through Dina Palmer. And specifically with representations that she will be making, there is some indication that Mr. Palmer may have been involved in child abuse. But we have agreed that at least at a minimum it was neglect and endangerment, which he would also be guilty of under the statute.
>
> At this point, Your Honor, we are not conceding anything simply because we don't know what Ms. Palmer will testify. However, with that understanding, we have realized that we might have to make certain concessions. However it's concession in regards to the big charge, which would be the murder charge . . . in this case.
>
> And so we've had discussions in regards to this strategy for over a year now, Your Honor. So he's well versed in regards to, you know, what possibly can be said, and he's been up to date even in regards to Ms. Palmer's most recent proffer statement that she gave to the State where now she puts the full onerous of the child's death on Mr. Palmer.

(ECF No. 35-1 at 47–48.) The following colloquy then took place between the trial court and Palmer.

| THE COURT: | Mr. Palmer, I just want to make sure that as [defense counsel] indicates that he's spoken with you, that you're considering the information in evidence that the State is seeking to present against you. Understand you have no burden whatsoever in this criminal trial, that the State has the entire burden of proof beyond a reasonable doubt. Do you understand that? |
|---|---|
| THE DEFENDANT: | Yes, sir. |
| THE COURT: | Is [defense counsel] accurate in the communicate - - when he states he's had communications with you regarding decisions and strategies that - - and you've had that conversation; is that fair? |
| THE DEFENDANT: | Yes, sir. |

(*Id*. at 48.)

30

Later, Palmer's trial counsel made the following comments at the beginning of his closing argument:

> Good afternoon, ladies and gentlemen of the jury. It would be absolutely ludicrous of me to stand before you and tell you that child abuse did not occur to RJ. Absolutely ludicrous. Is my client guilty of that? Under those four different versions that the prosecutor put up there, yes, he is guilty of that.
>
> If you just say that he saw it all and he just sat there and didn't do anything about it, right there he's guilty of child abuse and endangerment of this child. Okay. So in regards to finding him guilty of that, you have no other choice. That's what the evidence shows.

(ECF No. 37-1 at 64.)

After his trial, Palmer declared the following:

> At the time of my trial, I did not fully understand my attorney intended to make th[e concession that I was guilty of the two child abuse charges]. If my attorney had fully explained his plan to me and the ramifications, I would've objected to the attorney making any concessions on my behalf. While I recognize the court briefly canvassed me about the concession, I didn't have a full understanding of the concession at the time of that discussion.

(ECF No. 25 at 2.)

### b.    Analysis

"An attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy." *Florida v. Nixon*, 543 U.S. 175, 187 (2004).[4] Palmer fails to demonstrate that his trial counsel failed to meet this consultation duty. In fact, Palmer's trial counsel stated on the record, while in the presence of Palmer, that "*we* have

---

[4] Notably, in 2018, four years after Palmer's trial, the Supreme Court held that a defendant's Sixth Amendment right to determine the objective of his defense is violated if counsel, counter to the defendant's express instructions to maintain innocence, instead concedes guilt. *McCoy v. Louisiana,* 138 S. Ct. 1500, 1509 (2018). Importantly, however, "the Supreme Court has not made *McCoy v. Louisiana* retroactive to cases on collateral review." *Christian v. Thomas*, 982 F.3d 1215, 1225 (9th Cir. 2020).

1   realized that we might have to make certain concessions." (ECF No. 35-1 at 47 (emphasis added).)

2   Further, when questioned by the trial court, Palmer stated that he had communicated with his trial

3   counsel "regarding decisions and strategies." (*Id*. at 48.) Moreover, Palmer fails to demonstrate

4   that his trial counsel's concession amounted to deficient performance. Rather, it appears that

5   Palmer's trial counsel made a strategic decision to concede Palmer's guilt to the child abuse

6   charges. *See United States v. Thomas*, 417 F.3d 1053, 1056 (9th Cir. 2005) (finding that counsel

7   "had a sensible reason for not contesting [one of the charges because] it was, for all practical

8   purposes, incontestable, and he believed that doing so would enhance his credibility on counts

9   where the evidence was somewhat less clear and the penalties significantly greater").

10          Palmer also fails to demonstrate prejudice. Palmer argues that "[a]bsent the concession,

11   [he] could've presented a defense theory that [Dina] was responsible for the abuse, and [he] was

12   unaware of the abuse until after R.J. was rendered unconscious." (ECF No. 86 at 76.) This

13   argument is entirely belied by the record. Not only did Palmer make statements to law enforcement

14   admitting that he physically abused RJ, but he also reenacted that physical abuse on video. Further,

15   Palmer's inculpatory statements were consistent with other evidence: RJ's teacher's testimony that

16   RJ told him that Palmer physically abused him, the school counsel's testimony that RJ told her

17   that Palmer physically abused him, Hollingsworth's testimony that Palmer told him he had

18   physically abused RJ, and Dina's testimony that Palmer had physically abused RJ. Thus, Palmer

19   fails to demonstrate that there is a reasonable probability that he would not have been found guilty

20   of the child abuse charges had his trial counsel maintained his innocence on those charges.

21   *Strickland*, 466 U.S. at 694.

22          In sum, based on the record, Palmer's ineffective assistance of trial counsel claim is not

23   substantial because Palmer fails to demonstrate deficiency or prejudice under *Strickland*. Because

Palmer fails to demonstrate requisite prejudice necessary to overcome the procedural default of ground 5(e), it is dismissed.

### 7.    Ground 5(f)—failure to present a compelling mitigation case

In ground 5(f), Palmer alleges that his trial counsel failed to present a compelling mitigation case at sentencing. (ECF No. 58 at 34.)

### a.    Background information

Before Palmer's sentencing hearing, his trial counsel submitted five letters to the trial court from Palmer's friends and family.[5] (ECF No. 24-10.) Later, at Palmer's sentencing hearing, his trial counsel made the following comments: (1) Palmer was remorseful for his actions towards RJ, (2) Palmer was truthful with police during his interview at the hospital, (3) Palmer did not have a criminal record, (4) Dina, who was just as culpable, was sentenced to a possibility of parole, (5) Palmer did not act with malice and did not intend to kill RJ, (6) Palmer had no one to guide him in how to appropriately discipline a child, (7) Palmer was conducting Bible studies at the jail, (8) Palmer would be productive member of and have a positive impact on society if ever released from confinement, and (9) Palmer was not a violent man and was not likely to reoffend. (ECF No. 37-5 at 10–12.) Palmer's trial counsel asked that the trial court give Palmer at least the possibility of parole. (*Id*. at 11.) Later, at Palmer's postconviction evidentiary hearing, Palmer's trial counsel

---

[5] Palmer argues that "[o]n information and belief, the court didn't receive the[s]e letters," explaining that Palmer's sentencing memorandum, which contained these letters, does not appear on the docket sheet. (ECF No. 86 at 77–78.) Although the sentencing memorandum may not appear on the docket, it appears that the letters were submitted to the trial court before the sentencing hearing given that (1) the trial court did not correct Palmer's trial counsel's statement during the sentencing hearing that the letters had been submitted and (2) Palmer's trial counsel testified at the postconviction evidentiary hearing that the letters were submitted. (*See* ECF Nos. 37-5 at 12, 23-2 at 26.)

testified that he never employed an investigator to obtain mitigating evidence because Palmer

elected to have the trial court sentence him. (ECF No. 23-2 at 12–13.)

### b.    Analysis

Counsel's performance at the penalty phase is measured against "prevailing professional

norms." *Strickland*, 466 U.S. at 688. When challenging counsel's actions in failing to present

mitigating evidence during a sentencing hearing, the "principal concern . . . is not whether counsel

should have presented a mitigation case[, but instead] . . . whether the investigation supporting

counsel's decision not to introduce mitigating evidence . . . *was itself reasonable*." *Wiggins v.*

*Smith*, 539 U.S. 510, 522–23 (2003) (emphasis in original). "To perform effectively . . . counsel

must conduct sufficient investigation and engage in sufficient preparation to be able to present and

explain the significance of all the available mitigating evidence." *Lambright v. Schriro*, 490 F.3d

1103, 1116 (9th Cir. 2007) (internal quotation marks and brackets omitted).

Palmer fails to demonstrate that his trial counsel acted deficiently regarding presenting

mitigating evidence at his sentencing hearing. Palmer's counsel provided letters written by

Palmer's friends and family before the hearing and then made sound arguments at the sentencing

hearing regarding why Palmer deserved a chance at parole. In addition, Palmer fails to demonstrate

a reasonable probability that the result of his sentencing proceeding would have been different had

further mitigating evidence been presented. *Strickland*, 466 U.S. at 694. Indeed, Palmer fails to

demonstrate what mitigating evidence could have been presented, arguing only that "there was a

wealth of mitigation information that would've been available." (ECF No. 86 at 78.) This

conjecture is insufficient to establish prejudice. *See also Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir.

2019) ("*Strickland* prejudice is not established by mere speculation.") Accordingly, based on the

record, Palmer's ineffective assistance of trial counsel claim is not substantial because Palmer fails

to demonstrate deficiency or prejudice under *Strickland*. Because Palmer fails to demonstrate requisite prejudice necessary to overcome the procedural default of ground 5(f), it is dismissed.

## IV.     MOTION FOR EVIDENTIARY HEARING

In his motion for an evidentiary hearing, Palmer explains, *inter alia*, the following: (1) he did not receive a full and fair hearing in state court, (2) he made diligent efforts to litigate his claims as a *pro se* litigant, (3) he would like to question the police personnel who were present during his interrogation to provide support for ground 5(a), and (4) he would also like to question his trial counsel regarding his alleged failures. (ECF No. 87.) This Court has already determined that Palmer is not entitled to relief, and neither further factual development nor any evidence that may be proffered at an evidentiary hearing would affect this Court's reasons for denying relief. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."); *see also* 28 U.S.C. § 2254(e)(2). Thus, Palmer's request for an evidentiary hearing is denied.

## V.     CERTIFICATE OF APPEALABILITY

This is a final order adverse to Palmer. Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability (COA). This Court has evaluated the claims within the petition for suitability for the issuance of a COA. Under 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim

of the denial of a constitutional right and (2) whether this Court's procedural ruling was correct. *Id*. Applying these standards, this Court finds that a certificate of appealability is unwarranted.

**VI.     CONCLUSION**

IT IS THEREFORE ORDERED that the Second Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 **[ECF No. 58] is denied.**

IT IS FURTHER ORDERED that a **certificate of appealability is denied**.

IT IS FURTHER ORDERED that the motion for an evidentiary hearing **[ECF No. 87] is denied**.

IT IS FURTHER ORDERED that the Clerk of Court enter judgment accordingly and close this case.

Dated: March 14, 2024

_____
HOWARD D. MCKIBBEN
UNITED STATES DISTRICT JUDGE